## Hamilton, Appellant, *v.* John C. Mercer Home.

*Trusts and trustees—Charitable trust—Failure of trust.*

A charitable trust of real and personal property to found a home for "clergymen of the Presbyterian faith who are decayed by age or disabled by infirmity, and who do not use tobacco in any shape or form," will not be declared to have failed because of the practical failure of applicants for admission to the home, where the evidence shows that applicants were deterred, not by reason of the restriction against the use of tobacco, but by a restriction, imposed by the managers without any authority in the will, requiring applicants to separate from their wives, and that if the latter restriction were removed there would be more than enough applicants and their wives to fill the home.

Argued April 27, 1910. Appeals, No. 10, Jan. T., 1910, by plaintiffs and No. 83, Jan. T., 1910, by defendants, from decree of C. P. No. 2, Phila. Co., Dec. T., 1908, No. 2,058, dismissing bill in equity in case of John McLure Hamilton, Ethel H. Lucas and the Provident Life & Trust Company, trustees under the will of Lydia I. Biddle, deceased, v. The John C. Mercer Home for Disabled Clergymen of the Presbyterian Faith. Before FELL, C. J., MESTREZAT, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Bill in equity to declare failure of a charitable trust.

SULZBERGER, P. J., filed an opinion in part as follows:

The bill prays for a decree that certain assets and property of the defendant derived under the will of the late Ann Jane Mercer are held in trust for the heirs and next of kin of the said testatrix, and that a further decree be entered determining and enforcing the right of the plaintiffs as heirs and next of kin of the said testatrix to take said property absolutely.

It appears that Ann Jane Mercer died on April 5, 1886, having made her will on November 26, 1885, by paragraph second of which she provided as follows:

"Second.—Whereas I am seized and possessed of a certain Estate and Property called 'The Mount,' situate in the County of Montgomery in the State of Pennsylvania, which I desire to devote to pious and charitable uses. Now I do hereby give devise and bequeath all my said Estate and Property, called 'The Mount,' situate in the said County of Montgomery in the State of Pennsylvania, together with all the Buildings and Improvements thereon erected with any surrounding or adjacent Property acquired by my husband or myself forming part of the said Estate called 'The Mount.' Together with all the horses Carriages farming utensils furniture goods Beds and Bedding and all other personal property on the premises at the time of my decease which belong

to me, to my brother John Hamilton Junior of Bucks County in the State of Pennsylvania Attorney at law his heirs Executors Administrators and Assigns in Trust as soon as possible after my decease to cause and procure a Charter of Incorporation to be granted either by the Legislature or by the proper Court for an Institution or Home to be called 'The John C. Mercer Home for Disabled Clergymen of the Presbyterian Faith' to be established at the said Estate and Property called 'The Mount' which charter shall provide that the said Institution or Home shall be for the support and maintenance of selected Clergymen of the Presbyterian faith who are decayed by age or disabled by infirmity and who do not use tobacco in any shape or form and who in all things shall comply with the laws and regulations of the said Home otherwise to be subject to be discharged by the Board of Managers of said Home whose decision shall be final. That the number of inmates in the Home or Institution shall never exceed its annual nett Rent and Revenue and shall not exceed twelve in number. That the Board of Managers alone are directed to admit into the Home or Institution any clergymen of the Presbyterian faith decayed by age or disabled by infirmity who do not use tobacco in any shape or form and (and) to discharge them whenever it becomes necessary or expedient whose decision shall be final.

"That no part of the said estate and property called 'The Mount' and devised as aforesaid shall be sold or disposed of encumbered or applied to any other use or purpose than as a Home for Disabled Clergymen of the Presbyterian faith as above specified. And I further will and direct that as soon as the said Charter shall have been obtained and recorded my said Trustee shall grant assure and convey all the said ground with the Buildings and Improvements thereon erected, and all the personal property on the said premises belonging to me to the said 'The John C. Mercer Home for Disabled Clergymen of the Presbyterian Faith' their Successors and Assigns to

be used and occupied solely for a Home or an Institution for disabled Clergymen of the Presbyterian faith. And in order to provide some means for the support and maintenance of the said home or institution, I do give and bequeath to the said institution, as soon as the same is incorporated, the sum of one hundred thousand dollars in trust to keep the same invested in Loans or debts of the United States or of the State of Pennsylvania or in Bonds or Mortgages of real estate within this State free from all previous Incumbrances or in well secured Ground Rents and to collect and receive the Rents Interest and income thereof and to pay and apply the same to the current expenses of the said Home."

And by paragraph sixteenth of which she further provided:

" Sixteenth.—And as to all the Rest Residue and Remainder of my Estate whatsoever and wheresoever whether Real or Personal I do give devise and bequeath the same to my Executor hereinafter named John Hamilton Junior his heirs executors administrators and assigns to be by him applied and appropriated to such religious and benevolent uses and purposes for the Glory of God and the Extension of his Kingdom in the world, and for the welfare of suffering humanity as he my said Executor in his judgment shall see fit and proper. And my said Executor is not to be held accountable to any person or persons whatsoever for the appropriation of the said Residue of my estate, as I feel confident that it will be properly appropriated and administered by him to such religious and benevolent organizations as may stand in need of the same."

And by paragraph seventeenth of which she further provided:

"Seventeenth.—I do hereby authorize and empower my Executor above and hereafter named the full power and authority to convert change and modify from time to time at pleasure any and all investments of my said Estate. And I do also fully authorize and empower my

said Executor, as he may see proper to grant bargain and sell any portion of my real estate (except the property called 'The Mount' and the Property No. 1819 Delancey Place), either at public or private sale for the best prices that can be obtained therefor, and to receive and receipt for the purchase money. And to sign seal execute acknowledge and deliver the necessary Deeds and conveyances therefor to the purchaser or purchasers thereof his heirs or their Heirs and Assigns forever without any liability on the part of the purchaser to see to the application of the purchase money."

In pursuance of the directions of the will, the defendant corporation was organized under a charter granted by the court of common pleas of Montgomery county on June 21, 1886, by article eighth of which it was provided that:

"This corporation shall have the power to receive, hold and manage all the real estate and personal property devised and bequeathed by the second item of the will of the said Ann Jane Mercer, deceased, and to appropriate the same for the charitable uses and purposes, and in the way and manner provided and directed by the said will. It shall also have power to hold, purchase, transfer, and apply such other real and personal estate and property as it may acquire, not exceeding the amount limited by law; and all the property thereof shall be taken and held subject to the control and disposition of the members of the said corporation."

And by art. X of the said charter it was provided that:

"The property, real and personal, of the said corporation shall at all times remain under the control of its Board of Managers and no part thereof shall ever be subjected to the control of any other corporation, or be diverted from the uses and purposes herein designated."

After said incorporation, to wit, on October 30, 1886, John Hamilton, Jr., trustee under the will of Ann Jane Mercer, granted by deed to the said corporation defendant, in fee, all those several messuages and tracts of lands

together called "The Mount" situate in the county of Montgomery; and by another deed bearing even date therewith the said John Hamilton, Jr., as executor of Ann Jane Mercer's will, and as residuary legatee and devisee under said will, conveyed the said premises called "The Mount" to the corporation defendant in fee; and by releases, one dated October 30, 1886, and the other dated October 11, 1886, the legatees under Ann Jane Mercer's will released to the corporation defendant their interest in "The Mount" as legatees.

To the said corporation there was also transferred the sum of $100,000 in trust to pay and apply the income thereof to the current expenses of the home.

The bill alleges that the efforts of the managers of the home during the last twenty-one years to conduct that institution as directed by the will of the testatrix have proven absolutely fruitless; that it is now demonstrated that the charity provided for by the testatrix has not been, and cannot be, carried out; and that the charity has ceased to exist and has absolutely failed of its purpose.

Hence the prayers of the bill.

The answer denies that the charity provided for by the testatrix has not been and cannot be successfully carried out, and this raises the one substantial issue of fact.

The plaintiffs, in support of their contention, rely mainly on the circumstances that in the year 1908, the defendant corporation presented the following petition to the attorney general of the commonwealth:

Here follows a recital of the will and the facts relating to the organization of the corporation.

The petition continued as follows:

"Third.—The corporation has been in existence for more than twenty-one years and its managers have made every effort to advertise its benefits and to invite those who were entitled to its privileges to become residents of the Home. Besides the usual form of newspaper ad-

vertisements, circulars have been sent to the moderators of all Presbyteries in Pennsylvania and to all the members of several of the General Assemblies of the Presbyterian Church. Clergymen have been guests of the Home and members of the General Assembly have visited it. It has been recommended by resolution of the General Assembly of the Presbyterian Church to every minister under the jurisdiction of the Assembly. No better proof of the efficiency of the advertisements can be found than the fact that the comparatively few applications for admission that have been received by the managers have come from divergent, and not infrequently, most distant parts of the land. Notwithstanding the efforts of the managers, however, the primary object of the testatrix has been defeated by the few applications that have been received and the fewer applicants that have been admitted. In the twenty-one years since the institution of the Home only thirty-five applications have been received. Of this number twelve applicants were refused admission because they did not come within the class of beneficiaries designated by the will; eight did not pursue their applications, or after being approved, declined or neglected to enter, and fifteen were approved and became residents. Of the fifteen who thus entered, ten resigned or left the Home for various personal reasons not connected with the management of the institution, and four remained until the time of their death. Only one is now a beneficiary. The average of entrances has, therefore, been less than one a year, and the average of permanent residents less than one every four years.

"Fourth.—The primary object of the testatrix appears to have been to provide for disabled clergymen of the Presbyterian faith, who do not use tobacco. There are several hundred Presbyterian clergymen in the United States who come within the provisions of the will and who are receiving aid from the Presbyterian Church. The aid that they thus receive is entirely inadequate for their support and comfort. They object to entering a

home for various reasons; some because it would entail separation from their families, and others because of the professional and personal dislike to the thought of becoming residents of any institution. It is for these reasons and not because of the lack of beneficiaries who are entitled to the privileges of the Home that its benefits have been rendered almost null and of no effect. The Board of Managers, after serious consideration, are unanimously of the opinion that the primary object of the testatrix would be accomplished by payment of the income directly to the beneficiaries coming within the provisions of the will and selected by the Managers rather than by endeavoring to fill the Home with such beneficiaries. They are of opinion and now aver that the object that the testatrix had in view, namely, the maintenance of a Home, has practically and for all purposes ceased.

"Petitioner therefore, in accordance with the Act of Assembly in such cases made and provided, now prays leave to institute proceedings in the Court of Common Pleas of Montgomery County for the purpose of obtaining, if possible, authority from said Court to maintain the primary object of the testatrix by the payment to selected beneficiaries coming within the provisions of the will, of certain stipulated amounts to be determined by the managers of the institution instead of endeavoring to maintain a home or institution.

"The petitioner further avers that it is willing to become responsible for the costs of the said proceedings."

This petition was pleaded by the plaintiffs on the thirteenth section of the bill, and the defendants in their answer admitted it. No further evidence on the affirmative side of the issue above stated was submitted by the plaintiffs.

The defendants called witnesses on the other side. Peter Boyd, who has been connected with the defendant corporation from the beginning, testified that there have been fifteen inmates in the home at various times; that

six was the highest number at any one time; that the fund cannot support more than six; that the petition to the attorney general was presented, not because the home is an impossibility, but because the benefits of the testatrix's provision could be more widely extended by the application of the cy pres doctrine; that there are now 467 disabled clergymen of the Presbyterian faith getting relief from the board of ministerial relief of the Presbyterian church; that this board has requested the managers of the home to extend its benefits by not maintaining a separate home; that in consequence of these solicitations the petition was filed; that the home can be maintained; that its income is $6,000 a year, and the fixed charges for maintaining it without inmates $3,500 a year, leaving a net fund of $2,500 for supporting inmates; that at present prices four is the largest number that can properly be supported with this fund; that if the property were sold there would be a total fund of about $135,000, with a probable net annual income approximating $7,000, and that such income could do as much good to twelve as by maintaining the home could be done for four; that the wives of clergymen have not been admitted, because the beneficiaries described in the will are "disabled clergymen of the Presbyterian faith who do not use tobacco;" that the board have always construed the bequest as constituting an inability to take a wife with her husband; that if the admission of a wife with her husband were allowed, there would not be enough room for the people who would want to come in; that the accommodations would not admit of more than three clergymen and their wives, but that very few are willing to come without their wives; that the home has now one inmate and he is not actually in the home, but is taking care of it; that things have been kept in that condition pending the decision in this case; that since the filing of the bill there is another applicant.

The witness further deposed that of the thirty-five applicants, twelve were refused because they used tobacco

or were not Presbyterian clergymen; one or two were refused because they had an incurable ailment, and the home had no resources for hospital work. Those who were admitted seemed to have a pleasant time. Four died there, one of whom had lived there ten years. The scant numbers are largely due to the inability to bring their wives, and the petition to the attorney general was prompted by the feeling of the church at large that the benefits of the home will be more available if stipends are given to clergymen at their homes.

The Rev. William W. Heberton, the treasurer of the board of ministerial relief, testified that there are. 457 Presbyterian clergymen on their roll, probably only a small number of them use tobacco. There are altogether 9,000 clergymen in the Presbyterian church north and probably 4,000 in the Presbyterian church south. There is no other agency than the ministerial relief fund to take care of decayed Presbyterian clergymen north.

## OPINION.

The pith of the plaintiffs' case is that the objects of the trust created by the testatrix have ceased. The beneficiaries of her bounty were to be "clergymen of the Presbyterian faith who are decayed by age or disabled by infirmity, and who do not use tobacco in any shape or form." That there are hundreds of persons answering to this description is made clear by the uncontradicted evidence. The literal accuracy of the plaintiffs' charge is, consequently, negatived. Their reliance must therefore be on its substantial correctness. This, they think, is established by the fact that the defendant corporation made and filed the above-recited petition to the attorney general, in the third paragraph of which they aver that "notwithstanding the efforts of the managers, however, the primary object of the testatrix has been defeated by the few applicants that have been received and the fewer applicants that have been admitted;" and again in the fourth paragraph, "They are of opinion and now aver

that the object that the testatrix had in view, namely, the maintenance of a Home, has practically and for all purposes ceased."

This petition, however, settles no fact. It is at most evidence that the petitioner held certain definite opinions as to the impracticability of the charity which it is their duty to administer. The defendant corporation is the trustee, and its functions are exercised by a board of managers. The opinion of the trustee that the trust has definitely failed may, of course, be heard by the chancellor, but his judgment cannot be controlled by it. Before he can strike down a charitable trust his conscience must be satisfied. And this would be true, even if the plaintiffs and defendants formally united in their opinion and in the prayer for the decree.

Gifts to charity have a public character. They are in relief of the commonwealth, and the latter has an interest in their maintenance. Wanting its assent, agreements between parties, that the trust may be divested and its capital become the private property of one of them, are incomplete and ineffective.

It follows inevitably that if the agreement of both parties would be inoperative, the mere statement or petition of one of them, under oath or not, can have no greater power.

In Mormon Church v. United States, 136 U. S. 1–59, Mr. Justice BRADLEY said:

"The true ground is that the property given to a charity becomes in a measure public property, only applicable as far as may be, it is true, to the specific purposes to which it is devoted, but within those limits consecrated to the public use, and become part of the public resources for promoting the happiness and well-being of the people of the state. Hence, when such property ceases to have any other owner, by the failure of the trustees, by forfeiture for illegal application, or for any other cause, the ownership naturally and necessarily falls upon the sovereign power of the state; and thereupon the

court of chancery, in the exercise of its ordinary jurisdiction, will appoint a new trustee to take the place of the trustees that have failed or that have been set aside, and will give directions for the further management and administration of the property; or if the case is beyond the ordinary jurisdiction of the court, the legislature may interpose and make such disposition of the matter as will accord with the purposes of justice and right. The funds are not lost to the public as charity funds; they are not lost to the general objects or class of objects which they were intended to subserve and effect. The state, by its legislature or its judiciary, interposes to prevent them from dissipation and destruction, and to set them up on a new basis of usefulness, directed to lawful ends, coincident, as far as may be, with the objects originally proposed."

After carefully weighing the whole evidence, we cannot find that the extreme statements of the petition are to be accepted. The circumstances under which it was filed explain its character and determine its judicial value.

The testatrix established a trust which, in the opinion of many of the best minds in her church, savored of eccentricity. The church at large had constituted a board for the relief of the same general class of persons, and was, in the common opinion, doing more good with a given amount of money than the same sum would accomplish under the very definite terms of the will. A conviction became general that an abandonment of the peculiar notions of the testatrix would accomplish more of her real purpose than the adherence to them, and that, therefore, the trust fund should be held and used in the manner approved by the experience of the board of ministerial relief. This conviction naturally affected the mind of the defendant trustee and gave rise to the petition. It was based on the thought that a sufficient case for the application of the cy pres doctrine could be made out, and certain passages were, under the circumstances, unduly emphasized.

The trustees' state of mind, as thus depicted, would point to a mild kind of unconscious hostility to the trust which they were to administer. The thought, for instance, that a Presbyterian clergyman would have to desert his wife of many years, as a prerequisite to admission to the home, was read into the will. No word to that effect is written therein, nor is such a regulation fairly inferable therefrom. We cannot impute to a pious woman the idea that a minister of the gospel, should for the sake of a little added personal comfort, repudiate his life companion and thus set at naught the binding injunctions of human and divine law. To "support and maintain" an old clergyman means to enable him to keep himself and his wife. It would have been easy to specify the contrary, if the contrary had been meant. In such event the benefits would have been confined to single men or to widowers, but while she was careful to exclude tobacco-users, the testatrix said nothing about the more important matter.

There seems to be no doubt that if this restriction were removed, the home would be too small for the applicants, and against the removal of this restriction there is no valid reason.

If, therefore, the benefits of the defendants' fund have been unduly small, the remedy is to be sought, not in the destruction of the charity, but in its more efficient administration.

Fortunately, the powers of a court of equity are ample for the purpose. Whenever it is shown that trustees are derelict in the administration of their trust, the chancellor interferes to save the trust. This ancient remedy, under the inherent jurisdiction of the court, has been formally ratified by statute. The Act of June 16, 1836, sec. 13, P. L. 785, 789, confers upon us the jurisdiction and powers of a court of chancery so far as relates to

"IV. The control, removal and discharge of trustees, and the appointment of trustees, and the settlement of their accounts." And as regards the case in hand we

have the additional power conferred in the same section, subhead

"V. The supervision and control of all corporations other than those of a municipal character. . . ."

If the plaintiffs have a standing here, it would be easy to shape a bill and its prayers so that any inefficiency in management tending to destroy or to impair the trust may be corrected.

In accordance with these views the bill should be dismissed.

*Error assigned* amongst others was decree dismissing the bill.

*W. W. Porter*, of *Porter, Foulkrod & McCullagh*, with him *Townsend, Elliott & Townsend*, for appellants.— The complainants, being the representatives of the heirs at law of the testatrix, are entitled to all of the property bequeathed and devised by her to the charitable use which has ceased to exist: Slegel v. Lauer, 148 Pa. 236; Kirk v. King, 3 Pa. 436; Quin's Est., 144 Pa. 444; Brown's Est., 152 Pa. 401; Ruth's App., 10 W. N. C. 498.

The pleadings and the evidence show that the charitable use attempted to be created by the testatrix has failed and for all practical purposes has ceased to exist.

The wives of clergymen of the Presbyterian faith are not within the class which the testatrix sought to benefit: Fox's App., 99 Pa. 382.

*John G. Johnson*, with him *A. Culver Boyd* and *Maurice Bower Saul*, for appellee.—The John C. Mercer Home for Disabled Clergymen of the Presbyterian faith has not failed or ceased to exist as a charitable institution: Lazarus' Est., 142 Pa. 104; Kates' Est., 148 Pa. 471; Hess' Est., 150 Pa. 346; Coulston's Est., 161 Pa. 151; Lewis' App., 127 Pa. 127; Crosetti's Est., 211 Pa. 490; Cowan's Est., 184 Pa. 339; McPherran's Est., 212 Pa. 425; Plankinton's Est., 212 Pa. 235; Reinoehl's Est., 212 Pa. 359.

PER CURIAM, May 24, 1910:

The decree appealed from in No. 10, is affirmed at the cost of the appellant on the findings of the learned president judge of the common pleas that the charity had not failed. This conclusion makes it unnecessary to consider the question raised by the cross appeal of the defendant and it is dismissed.