# AMERICAN COLONIZATION SOCIETY

*vs.*

## ROBERT SOULSBY, ET AL.

——

## FERDINAND C. LATROBE, JR., AND JAMES W. HARVEY, JR., TRUSTEES,

*vs.*

## ROBERT SOULSBY, ET AL.

*Trusts : void against perpetuities; limitations; rights of trustee.*

Although a trust attempted to be created be void as in violation of the rule against perpetuities, yet the adverse possession of the trustees for more than twenty years may give a title against which equitable jurisdiction can not be evoked.   p. 617

A trust for the transportation annually to Liberia of such colored persons as may desire to emigrate to that country is void, because attempting to create an active trust to continue beyond the time limited by the rule against perpetuities. p. 617

The fact that trustees do not manage the trust property according to the terms of the trust, while no ground for declaring the trust at an end, may furnish ground for the interposition of a court of equity to correct the existing evils and enforce the terms of the grant, if possible.                    p. 620

*Decided January 10th, 1917.*

Two appeals in one record from the Circuit Court of Baltimore City. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*D. K. Este Fisher* and *Wm. G. Johnson* (of the District of Columbia bar), for the American Colonization Society, appellant.

*Eugene O'Dunne* (with whom were *Chas. F. Stein* and *Donald B. Creecy* on the brief), for the Trustees, appellants.

*Richard S. Culbreth* and *Leigh Bonsal,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

The appeals in these cases are from an order of the Circuit Court of Baltimore City overruling the appellants' demurrer to the amended petition of the appellees.

As the demurrers assail the sufficiency of the petition, it will be necessary for us to state fully the facts alleged in the petition.

These facts are substantially as follows: On June 22, 1886, Caroline Donovan, then eighty-two years of age, executed a "declaration of trust," which was on the following day duly recorded among the Land Records of Baltimore City.

This declaration of trust is in the following words, to wit:

"Whereas I, Caroline Donovan, of the State of Maryland, am possessed of certain real estate in the City of Baltimore * * * which at present is occupied by warehouses numbered, respectively, 85, 87, 89, 91, 93 and 95 South Charles street, at the northeast corner of

Charles and Camden streets; and whereas, for divers consideration me thereunto moving I intend that the American Colonization Society shall have the benefit of said real estate to the extent and in the manner hereinafter described; Now, therefore, that the said Society may be at once informed of the above intention, and become possessed of a vested interest in the property aforesaid beyond peradventure, to this end I do hereby declare that I hold the above property in trust for myself during my natural life, I receiving the rents and income thereof as though this declaration of trust had not been made. And after my death then in trust for Ferdinand C. Latrobe and James W. Harvey, Jr., and the survivor of them, and the heirs and assigns of the survivor, in special trust and confidence, nevertheless, to pay to the American Colonization Society the net income, rents and profits of the said real estate ascertained under the supervision of a court of equity, for the transportation annually to Liberia of such colored persons as may desire to emigrate to that country, the said trustees and the survivor, and the heirs and assigns of the survivor, to have the power, should the interest of the trust so require, by and with the approbation and consent of a court of equity first had and obtained, to sell and dispose of the said property, or any portion thereof, from time to time, for reinvestment, with the approbation of the court of such reinvestment, for the purposes that are herein expressed and declared. And if in any year the transportation of colored persons for that year should not require the net income of the said property for the same year, such income, or any balance remaining, shall be appropriated by the said Society to the maintenance of public schools for the education of colored children in Liberia."

Caroline Donovan died on March 5, 1890, without issue, leaving a last will and testament executed on the day before her death, in which she, after confirming a gift of her furniture previously made to one of her nieces, directed that her

entire estate should be converted into cash by her executors, of which she bequeathed to the Washington Lee University of the State of Virginia, the sum of $10,000; and to the Little Sisters of the Poor of Baltimore City the sum of $1,000.

She then directed that:

"All the rest and residue of the proceeds from the sale of my estate as above directed, together with all rents, income, profits, cash left by me, and the proceeds of all debts, dues and credits that may be collectible or converted into money without sale, I hereby authorize and direct my said executors to divide into nine equal parts, and one of said parts I give and bequeath absolutely to each one of my several nephews and nieces, following namely, to Carrie M. Crowle, John D. Crowle, Emily P. Edmundson, Laura Wamaling, Charles T. Wamaling, Lewis R. Wamaling, Frances Wamaling, Charles Soulsby and Robert Soulsby, that is to say, to each one of them one part or oneninth of the whole."

The American Colonization Society named in the declaration of trust as alleged in the petition, started in December, 1816, but was first incorporated by an Act of the General Assembly of Maryland passed at its December Session of 1831.    That Act was repealed and a new charter granted by the Act of 1836, passed March 14, 1837.    The corporation was empowered by the latter Act:

"to purchase, have and enjoy to them and their successors in fee or otherwise any lands, tenements or hereditaments by the gift, bargain, sale, devise or other act of any person or persons, etc., to take and receive any sum or sums of money, goods or chattels that shall be given, sold or bequeathed to them in any manner whatsoever; to occupy, use and enjoy or sell, transfer or otherwise dispose of according to the by-laws, etc., all such lands, tenements or hereditaments, money, goods or chattels as they (the corporation) shall determine to be most conducive to the colonizing, with

their own consent in Africa, of the free people of color
residing in the United States and for no other use or
purpose whatsoever."

Upon the death of Caroline Donovan her will was pro-
bated, and six days thereafter the trustees filed their petition
in the Circuit Court of Baltimore City, alleging the execu-
tion of the declaration of trust, with the provisions therein
contained, the death of Caroline Donovan and the right of
the American Colonization Society, in consequence of her
death to the rents and profits mentioned in the declaration
of trust; and concluded by asking the Court to supervise the
execution of the trust.

The Society filed its answer thereto, admitting the facts
alleged in the petition and consenting to the passage of a
decree as prayed.

The Court thereupon filed its order assuming supervision
of the trust, and in such order it directed that Ferdinand
C. Latrobe and James W. Harvey, Jr., trustees, "report
annually to the Court during the continuance of the trust."

The rents derived from the warehouses have ever since
been collected by the trustees and the net rents paid to the
American Colonization Society.

It is charged by the petitioners that the trust attempted to
be created is void because vague and indefinite and in con-
flict with the rule against perpetuities: "that it is void also be-
cause it is not within the corporate powers or purposes of
said American Colonization Society to maintain 'public
schools for the education of colored people in Liberia,' be-
cause the maintenance of such schools is in no way connected
with the colonizing in Africa, of the free people of color
residing in the United States, and because the maintenance
of public schools in Liberia for the education of colored
children would necessarily be largely devoted in the future
to the education of colored natives of Liberia whose ancestors
were never in the United States." And if this feature of the

trust which is so inseparably connected with the provision authorizing the expenditure of the net income, rents and profits of the real estate, for the transportation annually to Liberia, of such colored persons as may desire to emigrate to that country, is void, then this latter provision is also void, thereby making the entire trust void.

The petitioners charge, however, that, if the trust was ever valid, it is no longer a valid subsisting trust inasmuch as its objects and purposes can no longer be accomplished.

In support of this change they allege that the American Colonization Society has always expressed difficulty in getting negroes of a reputable character to colonize in Africa, which fact it is said is borne out by its reports issued from time to time. Its report of 1894 calls attention to the fact that there are few remunerative employments in Liberia, and in its report for the year 1901 it said that:

"Liberia, like every other state, needs good citizens * * * but this Society cannot take the responsibility of sending any emigrants to Liberia unless they have proved themselves to be men and women of good character, of intelligence, of at least an elementary education, industrious and persevering. But how can such a class of emigrants be obtained? Your committee would suggest that our honored Secretary be authorized to correspond with the principals of a large number of the most reputable African seminaries in this country and the management of our principal religious denominations, and to ask them to recommend such of their pupils as may possess the very highest moral and religious qualifications and who may wish to take up their residence in Liberia. And that from these pupils the selection to be made of such a number as it may be thought desirable to send to Africa during the coming year."

In the same report is found the statement that:

"There have been many applications for assistance in emigrating to Liberia during the past season. Most

of them, however, have been from the same class of people as for this purpose has sought the assistance of this Society during the past few years. They appear to think that a residence in Africa will furnish them with all that is desirable in life. We think that people who cannot do well in this country cannot reasonably expect to do better in Africa, and we are obliged to inform them that this Society is no longer the recipient of large sums for the purpose of sending colonists to Africa. Such contributions have long since ceased to come into our treasury, and we now have only such funds as have come to us for special purposes, and chiefly for education. During the past year the Society has sent out three negroes to Liberia."

The reports show as it is alleged, that the transportation of negroes from this country to Liberia came entirely to an end. As shown by the reports of 1905 and 1906 not a single colored person was transported to Liberia during either of those years, while the report of 1907 shows that a man and his wife were sent over in that year, but none were transported in either of the years 1908 and 1909 as shown by the reports of those years. It is alleged that since 1909 no public report of the operations of the society have been issued and therefore the petitioners have no knowledge of what has been done since that time, although they have asked the society for information, but have received none.

The cost of sending an emigrant to Liberia was from $65 to $75, it being the cost of a steerage passenger from New York via Liverpool to Liberia. The petition alleges that, as indicated by the reports of the society, the amount paid by the trustees to it during the years 1893 to 1909 was $63,362.36, an average for each of the seventeen years of $3,727.19 and during these years the total amount expended by the society for the transportation of colored people from this country to Liberia was $4,768.32. This amount, the petitioners believe, and so allege, was the total sum expended by the

society for this purpose received from all sources. During this same period the reports show, there was expended by the society for the education of negroes in Liberia the sum of $15,598.16, which included all money expended by the Society, whether received from the Donovan Trust or otherwise, and the average amount expended in each of these years was $917.54. It is thus shown, as the petitioners allege, that the total average amount for the transportation of negroes and for the education of negroes in Liberia amounted to $1,198.03 annually, which was $2,529.16 less per year than the alleged amount received from the trustees from the Donovan trust, as the average annual income from that fund was $3,727.19. Or stating the matter in another way, the receipts of the American Colonization Society from the "Donovan trust" in these 17 years exceeded by $42,995.88 the total amount expended by the Society for the two objects named in the declaration of trust. The office expenses of the Society as shown by the reports during these seventeen years averaged more than $3,000, no part of which the petitioners allege should have been borne by the Donovan fund. It is shown that the income of the society from securities other than the income received from the Donovan trust estate amounted to $2,236.22, not including the income for that year, of $1,236, received from the building owned by the society on Pennsylvania avenue, in the City of Washington. The petition further alleges that in the last printed report, as stated above, the interest on securities put down at $2,236.22 would indicate a principal of invested funds held by the society of about $45,000, or an increase of about $28,000 above the amount stated to be held by it in 1893. The petitioners also allege that so far as they have been able to discover, the American Colonization Society has at no time made any public statement of what has been done with the money received from the trustees of Mrs. Caroline Donovan. In fact, "the reports of the society do not even mention the name of Mrs. Donovan until the year 1908, when for the

first time the money received from the trustees in Baltimore
is put down under the name of 'Donovan.' Before that time
the money so received was put under the head of 'Annuities,'
although apparently kept separate and distinct from others
received." It further alleges that the petitioners "acting
through their attorney, have asked the society to give a full
statement of the money received and expended for the years
1910 to 1915, similar to the statements that were printed
before 1910. But the treasurer of the society has informed
your petitioners' attorney that until a meeting of the directors
of the society can take place in the fall, he is not in a position
either to grant or refuse the request as made." It is also
stated, as indicating that the activity of the American Coloni-
zation Society have been greatly curtailed in recent years,
that the publication of the "African Repository," an official
paper of the society, has been discontinued for want of sub-
scribers. After discontinuing its publication, bulletins were
regularly issued from time to time, these, too, have appar-
ently been discontinued, and as we have said, the annual
printed reports showing the operations of the society ceased
with the year 1909. The office of the society is said to be
515 Colorado Bldg., in the City of Washington. This is
shown by the statement on its letter paper, but upon exam-
ination it is found that "nowhere on the door of said office, or
elsewhere in said office, does the name of American Coloni-
zation Society appear, but, as a matter of fact, the said office
is the law office of the secretary of said society." It is also
alleged that until recently the petitioners had no knowledge
of the attempted creation of the trust "or any of the facts
hereinbefore alleged in relation thereto," and that "it is
only within the last six months that they had knowledge of
the fact that there are no longer negroes in the United
States who desire to be aided by the American Colonization
Society and transported to Liberia, and that until now the
petitioners have had no knowledge whatever of the corporate
powers of the American Colonization Society, and that imme-

diately upon acquiring this knowledge they have taken steps to file this petition."

The petition was filed on July 30, 1915, and asked that the Court declare the trust void and of no effect and that all right and title therein of the trustees and of the American Colonization Society is at an end, and that the property so held in trust thereunder "is the property of the heirs at law and residuary devisees of Caroline Donovan named in her will, and of the heirs, devisees and representatives of the said heirs at law and devisees now living."

It also prays that the Colonization Society give a full account of all moneys received by it from said trustees, how the same has been disbursed by it, and how much of the same has been invested by it and is now in its hands in order that such sums may be decreed to be the property of the aforesaid heirs at law and devisees of Caroline Donovan, etc., and the petition concludes with a general prayer for relief.

The trustees, as well as the American Colonization Society, filed their demurrer to the petition, the ground of their demurrer being the same as those found in the demurrer filed by the society.

These demurrers being overruled the trustees and the society each appealed from the order overruling them and two cases have been docketed in this Court. The two appeals however, will be considered and disposed of together.

As stated in the petition the appellees contend that the declaration of trust violates the rule against perpetuities and is void for indefiniteness. They assert, however, that if the trust was ever valid, it has since become inoperative and void because the objects and purposes for which it was created can no longer be accomplished.

In *Needles* v. *Martin*, 33 Md. 618, the devise was for a charitable purpose. The property was devised to Needles, Tyson and Jessop and their heirs and assigns, but simultaneously with the execution of his will, the testator executed another paper in the form of a letter of instructions to the

devisees which was attested by those who witnessed the will. In his letter he said: "It is my desire and will that you will hold the same in trust, invested in such manner and in such security as you may deem most safe and advantageous, and that the net income and proceeds thereof, as fast as the same may accrue, be applied by you to the education of free colored persons in the City of Baltimore."

The paper then provided for the filling of any vacancy which might occur by the death, disqualification or resignation of any of the trustees "for the purpose of carrying into effect and perpetuating his intention in relation to the education of free colored persons." In ascertaining the intention of the testator the letter was regarded as part of the will and was considered with it, and the Court held that the trust thereby created was a "perpetuity."

In the case of *Missionary Society* v. *Humphreys,* 91 Md. 131, where the devise was held void the testator devised lands to persons named in the will in trust to hold the same and to collect the rents and income therefrom, and after paying the taxes, the cost of keeping the property in repair and the debts of the testator, the balance of the rent was to be paid each year to the incorporated religious and charitable institutions therein named, in the proportions stated.

The contention was there made, that is made in this case, that the devise was void because it created a trust to which there was no limit of time. This Court said, as to such contention, "upon an examination of the will itself we not only fail to find an express limitation to the duration of the trust but the testatrix makes express provision for its indefinite continuance * * * by providing for the appointment of trustees to succeed those she had named in case of death, resignation or refusal of the latter to serve. We think there can be no doubt as to the intention of the testatrix. She intended by the creation of this trust to make a perpetual provision for the objects of her bounty."

The Court further said, quoting from *Deford* v. *Deford,* 36 Md. 178, in which the devise was held to be void, that "power is given to the trustees to appoint some one to succeed her in the trust after her death, and this of itself would render possible the continuance of the trust far beyond the prescribed limits.  But besides this if the trust were valid and the testator's intention could be carried into effect a court of equity would be bound to supply a trustee to execute the trust to remote generations."

It was said in *Missionary Society* v. *Humphreys* and *Deford* v. *Deford,* the fact that the trustees were authorized to sell the property, with the approval of the Court, does not change the character of the trust.   In the latter case the Court said:   "The fact that the testator, in another clause of his will, empowers his trustees to change the investments and reinvest as aften as may be deemed proper, by *making sales* or otherwise, does not change the nature of the trust, which *may* extend beyond the time limited, and does not therefore extricate the case from the operation of the rule; the *possibility* of such continuance the law regards as decisive in determining the question of perpetuity or not."

The contention was also made in the case of the *Missionary Society* v. *Humphreys* that the rule did not apply to devises and bequests to religious and charitable uses, but the Court answered, saying that if it did not apply in such cases "this Court in the case of Mr. Pratt's will, could have decided the question very easily by holding that whether there was a trust or not was immaterial, because if there was no trust the rule confessedly did not apply, and if there was a trust it did not apply because the devise was in favor of a charitable institution."   And this may be said of other similar cases decided by this Court, including the recent case of *Gray* v. *Orphans' Home,* 128 Md. 592, where the devises have been held valid because there was no trust.

Whatever may be the law elsewhere, we, following the decisions of this Court, must hold the trust in this case to be

void because it is a perpetuity in that it attempts to create an active trust which is required to continue beyond the period limited by the rule, but although the trust is void for the reason stated the petitioners are barred from recovery upon the ground of its invalidity, resulting from such cause, because of the adversary possession of the trustees of the trust property for a period of more than twenty years, prior to the institution of these proceedings.

In *Needles* v. *Martin,* a case very similar to the one before us, this Court said: "As a general rule, the Statute of Limitations will not apply to cases of express and continuing trust, for the very obvious reason that, as the title of the trustee is the title of the *cestui que trust,* his holding and possession will not be presumed to be hostile and adverse, and the trust being a subsisting, continuing one, no lapse of time will bar. But this rule is subject to limitations and restrictions, and whenever a trustee sets up an open, public, adverse claim against his *cestui que trust,* and denies that the trust any longer subsists, *or where a trustee recognizes another person as cestui que trust, long possession and continued enjoyment of the property under such recognition will be a bar in equity. Angell on Limitations,* 171, 172; *Robinson* v. *Hook,* 4 Mason's Cir. Co. Reps. 152; *Farnam* v. *Brooks,* 9 Pick. 212; *Kane* v. *Blocodgood,* 7 Johns. Chan. Rep. 123, 124."

The trustees in this case, ever since they entered and took possession, have held this property adversely to any and all claims of the petitioners, and during this whole period have recognized the American Colonization Society as their *cestui que trust,* by paying to it the net rent and income from such property; such holding we think was a bar in equity to the assertion of the right of the petitioners to such property, upon the ground of the invalidity of the trust caused by its being a perpetuity.

It now remains to be seen whether it is shown by the allegations of the petition that the objects and purposes for which the trust was created can no longer be accomplished.

The primary object and purpose of the trust was to provide means "for the transportation annually to Liberia of such colored persons as may desire to emigrate to that country." It was, however, provided by the grantor that "if in any year the transportation of colored persons for that year should not require the net income of the said property for the same year, such income, or any balance remaining, shall be appropriated by the said society to the maintenance of public schools for the education of colored children in Liberia."

It is not sufficient that the allegations of the petition show that the grantor's objects and purposes are not being carried out or accomplished—possibly owing to the neglect or mismanagement of those entrusted with the affairs of the society —but they must show that such purposes can not be carried out or accomplished by a proper management of its affairs.

It is shown by the petition that in the year 1905 and 1906 none were transported and only two in the year 1907, and none in the years 1908 and 1909. Whether there were any transported in the succeeding years is unknown to the petitioners, as they allege, but the petition, quoting from one of the reports of the society, says that: "There have been many applications for assistance in emigrating to Liberia during the past season."

These applications, however, were denied because it was thought that the applicants were not proper persons to be sent to Liberia.

It may be that the standard fixed by the society, as to the qualifications of persons to be sent, was too high, and we think it was, for it says in its report: "This society cannot take the responsibility of sending any emigrants to Liberia unless they have proved themselves to be men and women of good character, of intelligence, of at least an *elementary education, industrious* and persevering."

And it is then suggested that their secretary communicate: "With the principals of a large number of the most reputable African seminaries in this country, and the management of

our principal religious denominations and to ask them to recommend such of their pupils as may possess the very *highest religious and moral* qualifications, and who may wish to take up their residence in Liberia. And that from these persons the selection to be made of such a number as it may be thought desirable to send to Africa during the coming years."

If the policy outlined above was adopted and pursued by the society and only those that possessed the qualifications mentioned were considered as persons to be transported, this in itself may have been the cause of the alleged failure of the society to carry out the provisions of the trust.

In the case of *Hamilton* v. *J. C. Mercer Home,* 228 Pa. 410, there was a devise of the property and money for the creation and maintenance of a home for the clergymen of the Presbyterian faith, "who are decayed by age or disabled by infirmity and who do not use tobacco in any shape or form." Proceedings similar to these were instituted in that case, asking for the termination of the trust, because of the failure of those entrusted with the affairs of the institution to accomplish the purposes of the testator, in said home. The difficulty in that case was that the wives of the clergymen were not admitted to the institution, and as the clergymen would not leave their wives, those in charge of the institution could not get clergymen in sufficient numbers, to enter the home. The Court there said "to 'support and maintain' an old clergyman means to enable him to keep himself and wife." It would have been easy to specify the contrary, if the contrary had been meant. In such event the benefit would have been confined to single men or to widowers, but while she was careful to exclude tobacco users, the testatrix said nothing about the more important matter.

"There seems to be no doubt that if this restriction were removed, the home would be too small for the applicants, and against the removal of this restriction there is no valid reason."

"If, therefore, the benefit of the defendant's funds have been unduly small, the remedy is to be sought not in the destruction of the charity, but in its more efficient administration."

The grantor in this case provides for the transportation of such *colored persons* as desire to emigrate, etc. She does not attempt to define their qualifications. Of course, the society was not expected to transport to Liberia persons that would be a menace to its society or institutions, and on the other hand, they were not to place the standard of qualifications too high, by accepting only those of the *"highest moral and religious qualifications."* If the society is improperly managed in respect to the business placed upon it, in consequence of the grant, then the aid of a Court of equity may be invoked in order that the evils existing may be corrected and the provisions of the grant executed, if possible. *Hamilton* v. *J. C. Mercer Home,* 228 Pa. 410.

In our opinion the allegations of the petition are not sufficient to entitle the petitioners to the relief sought, and the demurrers should have been sustained. Therefore, the order of the Court overruling the demurrers will be reversed, and the cause remanded.

*Order reversed and cases remanded, the appellees to pay the costs.*