## In re Trexler Orphans' Home

*Butz & Rupp*, for petitioner.

*William S. Hudders*, for Good Shepherd Home.

*O. E. Boyle, Daniel Miller, George M. Lutz* and *Charles K. Derr*, for Bethany Orphans' Home.

*Oliver W. Frey*, for Lutheran Orphans' Home in Berks County.

*Groman & Rapoport* and *H. J. Hartzog*, for Children's Home of Bethlehem and Allentown.

*Butz & Rupp*, for Children's Aid Society of Pennsylvania.

RENO, P. J., January 2, 1933.—The Henry A. Trexler Orphans' Home is a corporation of the first class. Its petition praying for a dissolution is before us. It avers, inter alia, that by decree of the orphans' court of this county it received a fund hereinafter described and that the purpose for which it was received has altogether failed. Accordingly it prays, as stated, for an order

of dissolution and authorizing it to distribute its fund "so that it may not be diverted from the objects and purposes set forth in the charter of petitioner and in the will of the testator." In short it asks the court, pursuant to the cy pres doctrine, to apply its fund to a purpose consistent with its charter and the will of the original donor of the fund.

At various times leave was granted to the following corporations to intervene: The Children's Home of Bethlehem and Allentown, the Bethany Orphans' Home, the Children's Aid Society of Pennsylvania, the Lutheran Orphans' Home in Berks County, and the Good Shepherd Home. The Attorney General also granted permission to each of these to intervene in the proceedings.

Testimony was taken in relation to the claims of these several institutions and from it the following facts have been formulated.

### Finding of Facts

#### (a) General

1. Henry A. Trexler, a citizen of the City of Allentown, County of Lehigh, State of Pennsylvania, died January 28, 1905.

2. By his last will and testament dated 1897 (without month or day), and duly probated February 17, 1905, he devised his residuary estate, after several life estates, "in trust to the Mayor of the City of Allentown, Pennsylvania, to be used immediately to found a Protestant Orphans' Home to be located in the City of Allentown, Pennsylvania."

3. The life estates terminated in 1914, and Hon. Charles W. Rinn was then mayor of the City of Allentown.

4. The Henry A. Trexler Orphans' Home was incorporated by decree of the Court of Common Pleas of Lehigh County on June 7, 1915, "to establish and maintain a home for orphan children of Protestant parents and to provide for their care, training and education."

5. Charles W. Rinn, the mayor of the City of Allentown, reported "that he is now unwilling to administer said trust upon his own responsibility" and as a result of proceedings in the Orphans' Court of Lehigh County, which need not be here outlined or detailed, the residuum of the estate of Henry A. Trexler, deceased, was, pursuant to the decree of that court, paid "to the Henry A. Trexler Orphans' Home [the corporation mentioned in paragraph 4, supra] for the purpose of immediately founding a Protestant orphans' home and for carrying out the provisions of the will of the deceased in reference to said trust so far as the same can be ascertained and carried into effect consistent with law and equity."

6. The Henry A. Trexler Orphans' Home received the fund in December 1915 and since that date has canvassed and debated many plans for the establishment of an orphans' home and is now "of the opinion that the funds in its hands are entirely inadequate for the establishment of a home pursuant to the intention of the testator and the purposes expressed in the charter of said corporation, and that a survey of the charities in the City of Allentown and the community needs establish the fact that it is unlikely that the funds and property in the hands of the corporation could be wisely used to build a home and to maintain the same, since prudence would require the accumulation of a large endowment fund to insure the permanency of the home, and there is no likelihood that such an endowment fund could be raised by popular subscription or otherwise in the City of Allentown."

7. At a meeting of the corporation on August 21, 1931, the following resolution was adopted:

"Resolved, after the most careful thought and deliberation, and the discussion of various suggestions, that it is the unanimous opinion of the Board of Direc-tors of the Henry A. Trexler Orphans' Home, that the assets in the hands of the corporation, amounting in the aggregate to the sum of $103,384.68, are insufficient in amount to warrant an undertaking to build a home for Protestant orphan children, within the intent of the will of Henry A. Trexler, deceased, and the purposes for which the corporation was formed;

"That if any home were erected a large fund should be established properly to endow the same to provide an annual income to carry on the work of such a home;

"That after a careful survey of conditions in the City of Allentown and the activities of existing charities, the board is of the opinion that it is not likely that a home, such as was intended by the testator and contemplated in the purposes of the corporation, can be established in the City of Allentown for many years to come;

"That a proper application be now made to the Court of Common Pleas of Lehigh County to surrender the charter of the corporation, requesting that it be now liquidated and that the property of the corporation be distributed as the court may deem best, and as nearly as may be to carry out the purposes of the corporation and the charitable intent of Henry A. Trexler, deceased, as set forth in his will."

8. The corporation has the following assets: Real estate, $20,000; personal property, $83,384.68; total, $103,384.68.

### (b) The Good Shepherd Home

1. The Good Shepherd Home was organized on February 21, 1908, when the first orphan child was taken into the parsonage of the present superintendent, the Rev. Dr. John Raker, at No. 630 St. John Street, Allentown, Pa. On April 1, 1908, the first property was purchased for the use of the home at Sixth and St. John Streets, Allentown, Pa. The home still occupies that site and adjacent property since purchased. The property now consists of a tract of land on St. John Street, between Fifth and Sixth Streets and extending to Chester Street on the rear. Upon that property are two buildings for children and cottages for girls, babies, and old people. In addition to this property, the home also owns a farm of approximately 156 acres and other unimproved land on Fifth Street between Chester and Cleveland Streets near the property on St. John Street already described.

2. The home was incorporated on November 15, 1909, by a decree of the Court of Common Pleas of Lehigh County and therein it is set forth that the purpose of the said corporation is: "The said corporation is formed for the purpose of providing a Christian home for crippled orphans, infant orphans, destitute children, old people, and aged or disabled ministers."

3. The Good Shepherd Home is affiliated with the Ministerium of Pennsylvania, which is the governing body of the United Lutheran Church in America and has ecclesiastical authority over the churches in the eastern part of Pennsylvania. The superintendent is an ordained minister of the Lutheran Church and its board of trustees contains members of that denomination.

4. The purpose of the Good Shepherd Home is to provide a Christian home for orphan children, crippled orphan children, destitute children, old people and aged and disabled ministers. The benefits of the home are not restricted to children of Lutheran parents. There are presently in the home 15 children who are of Lutheran parents, 10 of Reformed parentage, 5 of Mennonite, 4 of Methodist, 3 of Evangelical, 2 of Baptist, 1 of United Brethren, 3 of Roman Catholic,

2 of Greek Catholic, 1 of Hungarian Catholic and 17 children whose parental religious affiliations are unknown.

5. There are presently 63 children and 32 old people in the institution. Of the children 28 are crippled. Twenty-eight of the total number of children are from the City of Allentown. During the 25 years of its existence the home has helped almost six hundred needy children and about sixty old people.

6. In addition to providing support and maintenance, the Good Shepherd Home provides an education for them by sending them to the public schools of the City of Allentown, including the high school, and in some instances to private business colleges and to Muhlenberg College. At present one of its charges is a student at the Mt. Airy Lutheran Theological Seminary. Those children who are not able to attend the public schools because of their crippled condition, of which there are 5 or 6 in number, are taught in the home. All the children attend the Grace Lutheran Church and the Sunday School in connection therewith, which is regarded as the church of the home.

### (c) Bethany Orphans' Home

1. The Bethany Orphans' Home was founded at Bridesburg, Pa., on July 13, 1864, and was moved to Womelsdorf in Berks County, Pa., on October 1, 1867. It was originally incorporated as "Orphans' Home of the Shepherd of the Lambs" by a special act of the General Assembly approved February 17, 1865, P. L. 174. By decree of court its name was changed on October 13, 1873, to "Bethany Orphans' Home."

2. The Bethany Orphans' Home is affiliated with the Reformed Church. It reports regularly to the Eastern Synod and also to the General Synod of that denomination and is conducted under the direction of the Board of Orphans' Home of the General Synod of the Reformed Church.

3. The home is located in Heidelberg Township, Berks County, Pa., about 1 mile from the Borough of Womelsdorf and 16 miles west of the City of Reading. The home owns approximately 95 acres of land, of which 20 acres are occupied by buildings and plant and 75 acres are under cultivation. It maintains 8 cottages, of which 6 are used by the children and 2 are used for dormitory purposes. There is a total of 17 buildings for various purposes, 1 of which is an infirmary.

4. Besides providing the usual accommodations and maintenance for orphan children, the home provides educational facilities for those of grade school age in a school located upon the premises, which is taught by teachers furnished by the school district of the township. The older children are sent to the high school at Womelsdorf and those who desire collegiate and seminary education are provided with the means for attaining the same. Religious services are conducted in the home every Sunday and devotional services every evening.

5. On August 4, 1932, there were 216 children in the home. Practically all of these were orphans. Twenty had been abandoned by either or both parents. No crippled or disabled children are admitted, inasmuch as there are no facilities for caring for children of that class. The children are admitted at any age, from birth to 18 years. Of the children in the home on the date aforesaid, 12 had been admitted through Reformed Churches in the City of Allentown or vicinity. Twenty-four were admitted through churches in the Lehigh Classis, which is a subordinate body of the Reformed Church having jurisdiction over churches in Lehigh and Carbon Counties. Since the foundation of the home there have been 86 children admitted from the City of Allentown and approximately three hundred from the city and vicinity.

(d) Lutheran Orphans' Home in Berks County

1. The Lutheran Orphans' Home in Berks County, more familiarly known as the Topton Orphans' Home, was founded as the result of a movement originating in the Reading Conference of the Lutheran Ministerium of Pennsylvania, which is the governing body of those churches of the United Lutheran Church in America located in the eastern part of Pennsylvania. It was incorporated by decree of the Court of Common Pleas of Berks County, dated November 31, 1896. It is maintained and conducted under the auspices of the Ministerium of Pennsylvania. Its superintendent is a minister of that denomination and its board of trustees is elected by the Reading Conference.

2. The institution is located at the Borough of Topton, Berks County, Pa., where it owns 250 acres of land and maintains 8 buildings including an infirmary.

3. It provides the usual facilities for orphan children and endeavors to give them a proper secular and religious education and training. The children are educated in the schools on the grounds of the institution up to and including the eighth grade. Thereafter, they are sent to high schools either at Topton or Kutztown. Some of the children have been graduated from the Keystone State Teachers College at Kutztown and 10 of its children have been graduated by the Mt. Airy Lutheran Theological Seminary. The teachers in the schools upon the grounds of the home are supplied by the school district of the borough.

4. There are presently 175 children in the institution. Of these 92 children are of Lutheran parents and 83 are children of non-Lutheran families including 6 of the Catholic faith. Children are accepted at any age and range from $2\frac{1}{2}$ years to 18 years. There are at present 21 children from the City of Allentown, 3 from the immediate vicinity of Allentown and 4 who were placed through the Allentown Family Welfare Association.

(e) Children's Home of Bethlehem and Allentown

1. The Children's Home of Bethlehem and Allentown was originally incorporated as "The Children's Home of South Bethlehem" and was incorporated under that name by a charter granted by the Court of Common Pleas of Northampton County on June 7, 1886. This charter was amended on May 10, 1926, by changing the name to "Children's Home of Bethlehem and Allentown." The home is located in Salisbury Township, Lehigh County, approximately a fourth of a mile from the boundaries of the City of Allentown. The institution owns about $5\frac{1}{2}$ acres of land and occupies one building.

2. The purpose of the institution is to provide for the temporary care and maintenance of poor or destitute children until homes can be secured for them. The home is not confined to orphans and includes children who have been abandoned by their parents. When it is possible to do so foster homes are found for the children. If it is impossible to find such homes the children are cared for in the institution until they are 16 years old. The institution coöperates with the Children's Aid Society of Lehigh and Northampton Counties. Those of the children who are Protestant in their religious affiliations attend St. Mary's Chapel of the Episcopal Church but they are at liberty to attend the church of their choice. They attend the public schools of Bethlehem.

3. At the end of May 1932, there were 62 children in the institution and at the time of the taking of the testimony there were 53 children. Of the children in the institution in May 1932, 57 were children of Protestant parents and 5 were children of Catholic parents. Eighteen of these children were from the City of Allentown, 11 from Lehigh County outside of Allentown and 33 from Northampton County.

4. The Children's Home of Bethlehem and Allentown is partially maintained by appropriations made by the General Assembly of the Commonwealth of Pennsylvania.

### (f) Children's Aid Society of Pennsylvania

1. The Children's Aid Society was incorporated by a charter dated February 17, 1883. The main office of the society is located in the City of Philadelphia but it operates throughout the State of Pennsylvania. Under its charter it has authority to establish branches in the various counties of the State, and it did establish a branch in Lehigh County in August 1927.

2. The society does not maintain any home or institution. It provides for the welfare of destitute children, whether orphans or not, and for that purpose maintains a bureau of public information concerning charities, protects children from cruelty, assists in the care of children needing help, secures foster homes for them, and provides necessary medical and dental care.

3. At the end of June 1932, 50 children were under the care of the Lehigh County branch of the Children's Aid Society, of whom 48 were Protestant and 2 of the Catholic faith. Of this number about one half were orphans. The maintenance of these children is provided for by charitably inclined persons and by appropriations made by the local authorities of the State. Those in Lehigh County are maintained partially by appropriations made by the county.

### Discussion

### (a) Jurisdiction

Obviously, the problem presented by the foregoing statement of the facts involves the application of the cy pres doctrine. And, inasmuch as the corpus with which we are dealing represents the residuum of a decedent's estate, it is conceivable that jurisdiction to apply that doctrine might reside in the orphans' court, albeit, the question arises upon the dissolution of a corporation. Surely, if the corporation were merely a substituted trustee, the power to appoint a new trustee would seemingly be within the jurisdiction of that court. At all events, the question of jurisdiction stands at the very threshold of this case and requires solution.

As we have said, the matter presented to this court is a petition for the dissolution of a corporation. Of that, this court has exclusive jurisdiction: Act of April 9, 1856, P. L. 293. As an incident to that power, it has exclusive authority to settle the accounts of the dissolved corporation and divide its effects "among the corporators entitled thereto." This however, in the language of the same act, is subject to the proviso "that no property devoted to religious, literary, or charitable uses shall be diverted from the objects for which they were given or granted". Thus the same legislation which entrusts to this court the power to decree dissolution of corporations requires the court to see to it that its property devoted to charitable uses is not by the reason of the dissolution diverted from that object.

This act would seem to constitute a complete answer to the question. For, although the property of petitioner came to it by decree of the orphans' court, there is no suggestion that it was merely a substituted trustee, that is, a trustee in place of the mayor of the City of Allentown to whom the testator devised his residuary estate. Rather, the mayor having refused to act and having ascertained that the project could not be carried out by him, the orphans' court, applying the cy pres doctrine, directed the payment of the fund to the corporation. The corporation was not expressly constituted a trustee nor made expressly accountable to the orphans' court. It took the property and the only duty imposed upon it was to found and maintain an orphans' home in accord-

ance with the testator's will. It may well be that the orphans' court, by reason of legislation which need not be specifically discussed (see, e. g., the Orphans' Court Act and the Fiduciaries Act, passim) also has jurisdiction, but, even so, that jurisdiction is concurrent with that of the court of common pleas, especially as it relates to corporations. This proposition is distinctly sustained by the Act of April 26, 1855, P. L. 328, sec. 10, as amended by the Act of May 23, 1895, P. L. 114, which enjoins upon the "orphans' court, or court having equity jurisdiction in the proper county, to supply a trustee, and by its decrees to carry into effect the intent of the donor or testator" in relation to "religious, charitable, literary or scientific uses." Doubtless, it was upon one of these theories that the common pleas courts in Hamilton v. John C. Mercer Home, 228 Pa. 410, and Scott's Estate, 28 Dist. R. 292, adjudicated disputes relating to legacies and devises in the possession of charitable corporations.

It should be stated that all of the parties, original and interveners, agree that this court has jurisdiction of the subject matter of this proceeding. However, their consent cannot confer jurisdiction, and we have made this preliminary examination of the question so as to assure ourselves of power to deal with the question before passing to its merits.

### (b) The cy pres doctrine

"Cy pres" means literally "as near to": 17 C. J. 695. "The meaning of the doctrine of *cy pres*, as received by us, is, that when a definite function or duty is to be performed, and it cannot be done in exact conformity with the scheme of the person or persons who have provided for it, it must be performed with as close *approximation* to that scheme as reasonably practicable": Philadelphia v. The Heirs of Stephen Girard, 45 Pa. 9, 28.

"The *cy pres* doctrine is one under which Courts of Chancery act, when a gift for charitable uses cannot be applied according to the exact intention of the donor. In such cases the courts will apply the gift, as nearly as possible (*cy pres*) in conformity with the presumed general intention of the donor; for it is an established maxim in the interpretation of wills, that a court is bound to carry the will into effect if it can see a general intention consistent with the rules of law, even if the particular mode or manner pointed out by the testator cannot be followed": Bispham, Principles of Equity (11th ed.), sec. 104.

"It is accordingly well settled by decisions of the highest authority, that when a gift is made to trustees for a charitable purpose, the general nature of which is pointed out . . . and no intention is expressed to limit it to a particular institution or mode of application, and afterwards, . . . by change of circumstances the scheme of the testator becomes impracticable, . . . the fund, having once vested in the charity, does not go to the heirs at law as a resulting trust, but is to be applied by the court of chancery . . . as near the testator's particular directions as possible, to carry out his general charitable intent"; Mr. Justice Gray in the leading case of Jackson v. Phillips et al., 96 Mass. [14 Allen] 539, 580.

" . . . property devoted to a charitable and worthy object, promotive of the public good, shall be applied to the purposes of its dedication, and protected from spoliation and from diversion to other objects. Though devoted to a particular use, it is considered as given to the public, and is, therefore, taken under the guardianship of the laws. If it cannot be applied to the particular use for which it was intended, either because the objects to be subserved have failed, or because they have become unlawful and repugnant to the public policy of the State, it will be applied to some object of kindred character so as to fulfill in substance, if not in manner and form, the purpose of its consecration": Mormon Church v. United States, 136 U. S. 1, 51.

The cy pres doctrine is not, however, a broad and unlimited authority to chancellors to distribute a decedent's estate according to the chancellor's notions of policy or justice or his own charitable inclination. He cannot dispose of the testator's property as he would his own. His chart is the testator's will and his compass the testator's expressed intent. The chancellor may not write a new will for the testator; he must find the testator's intent and, having found it, give effect to it, departing from the terms of the will only insofar as altered conditions require it.

Passing from these general principles to the facts of this case we observe at once that the testator's general intent was to consecrate his estate to the welfare of orphans. Moreover, he contemplated that (*a*) the orphans were to be cared for in a home, (*b*) that the home should be Protestant, and (*c*) that the home should be located in Allentown. This intent he expressed so clearly that there is no occasion whatever for speculating about its meaning. The expression of the intent that the orphans who were the objects of his bounty should be cared for in a home is explicit and it excludes from his scheme all noninstitutional methods or programs for caring for orphans. His further intent was that the home should be Protestant, and this includes the idea that the home should be under the management of Protestants and that the religious atmosphere, ideals and training should be Protestant in their outlook and methods. It does not, however, include the idea that his bounty was restricted to children of Protestant parents, and in this respect the charter of the Henry A. Trexler Orphans' Home was drawn less broadly than the terms of his devise. He specified that the home should be located in Allentown and, although he does not restrict his bounty to Allentown orphans, it is plain that he wished to have the home convenient of access to Allentonians. When one remembers that when he made his will in 1897 there was no orphans' home in Allentown and that the intervening institutions had then been established, we can understand, without a great stretch of the imagination, that the testator's desire was to give to Allentown an institution of the type that was elsewhere established and maintained. Indeed one is tempted to say that his primary intent was to give Allentown an institution for the care of orphans.

Now the only respect in which his scheme has failed is that the sum he made available has been found inadequate for the purpose of establishing and maintaining an orphans' home. This fact is alleged by the petitioner and not denied by any one. It must be and is taken as the foundation stone of this adjudication. But the objects of his bounty remain. There are still orphans requiring the charity of society. The intention that those orphans shall have the oversight of Protestant auspices is still possible. The final and indeed the only real question is, whether that care and training can be bestowed in Allentown.

We are not suggesting that, if that care and training cannot be provided in Allentown, the charity must fail. Rather, we are saying that every effort must be made to effectuate the testator's intent; and that, since that intent contemplated care and training in Allentown, every effort must be made to find in Allentown the means by which his scheme can be carried out. Of course, failing in that quest, other localities may be considered and constituted the means whereby the testator's intent is effectuated. But there must be no resort to non-Allentown institutions until it is found impossible to carry out his intent in Allentown. All the cases wherein a testator's bounty has been administered in a place other than that designated by him are based upon a judicial finding that the place fixed upon by him was impossible, impractical or, perhaps in a few cases, undesirable: Kramph's Estate, 228 Pa. 455; Mears's Estate, 299 Pa.

217; Hempstead et al., Trustees et al. v. Meadville Theological School et al., 284 Pa. 147; Toner's Estate, 260 Pa. 49; Curran's Estate, 16 D. & C. 603. Until that appears, the place fixed by the testator is the only place. Because institutions located in other places can also do what might have been done in the testator's place cannot authorize a court to transfer the testator's bounty to other places or to permit such institutions to share in his bounty.

These conclusions point out the path of our duty and they irresistibly designate the Good Shepherd Home as the successor to this trust. It is an orphans' home, none the less so because it also cares for the aged, albeit in separate buildings. It is a Protestant home, that is, it is under Protestant management and it inculcates the religious doctrines of the Protestant churches. It is located in Allentown. Thus, it meets every one of the testator's requirements, and its designation as the successor of the corporation about to be dissolved involves only the transfer of his bounty from one corporate body to another.

No other of the intervening institutions meets the testator's requirements. The Lutheran Orphans' Home in Berks County and the Bethany Orphans' Home are indeed homes and Protestant homes, but they are not located in Allentown. The Children's Home of Bethlehem and Allentown is not located in Allentown, although it is so near to Allentown and is esteemed so highly by Allentonians that, in the absence of an institution in Alletown, it might well be regarded as an Allentown institution. However, since it receives an appropriation from the State to which it is entitled upon the theory that it is a nonsectarian institution (Constitution, art. III, sec. 18) it is doubtful whether it can qualify as a Protestant home within the meaning of the testator's will. The Children's Aid Society cannot qualify upon any count. It does not maintain a home; indeed, it questions the advisability of caring for orphans in homes and maintains that the noninstitutional system of care is the proper method for rearing orphan children. It is not a Protestant institution and it is not located in Allentown.

The law and the testator's will point out the Good Shepherd Home as the one institution which under the cy pres doctrine is qualified for this trust. The managers of the other intervening institutions will understand that in this decision there is implied no lack of esteem for their work. Their homes are worthy institutions of the highest type. This is the proof in this case and it is abundantly corroborated by our own observations. The good Shepherd Home is likewise a most worthy institution. Its superintendent is a spiritual man of the highest attainments and his institution is filling a great need and winning a notable place in the affections of this community. Indeed, one suspects that had the Good Shepherd Home been in existence when the testator wrote his will he would have designated it as the almoner for his generosity.

### (c) The terms of the decree

We have been giving consideration to the terms of the decree which is to be entered. In the first place, seeing that the Good Shepherd Home maintains persons who are not orphans, the decree must restrict the benefits of this gift to its orphan guests. To that end the fund must be kept separate and intact. Then, too, keeping in mind that so many institutions are tempted to engage in building operations ofttimes to the detriment of the institution, provision must be made so that during a fixed period of years no part of the corpus shall be expended for buildings or plant except with the approval of this court. Meanwhile, the fund must be invested only in securities which by law are designated as suitable for trust funds and the income only shall be available for the support and maintenance of orphans.

The Good Shepherd Home will be expected to recognize the munificence of Henry A. Trexler. Perhaps a building in which the orphans are housed can be named in his honor. At least the authorities of the home will provide a suitable memorial tablet.

And, finally, it has come to our attention that the grave and monument of Henry A. Trexler require repairs and care. The testator gave all he had for this cause. He gave in entire self-forgetfulness. No provision has been made for the perpetual care of his last resting place. The Good Shepherd Home will be required, as a condition in the decree, to pay all outstanding indebtedness for the care of his cemetery plot, to put the plot, his monument, and that of his wife in good condition and to assume and pay the sum necessary to assure proper and perpetual care thereof.

### Conclusions of Law

1. The Henry A. Trexler Orphans' Home is entitled to a decree of dissolution.

2. The charitable bequest of Henry A. Trexler which was paid to Henry A. Trexler Orphans' Home failed because the sum devised was inadequate to establish and maintain a separate home for that purpose.

3. The Good Shepherd Home, by virtue of the cy pres doctrine, is entitled to the devise of Henry A. Trexler, subject to the conditions hereinbefore set forth.

4. The costs of this proceedings shall be paid out of the fund.

### Decree nisi

Now, January 2, 1933, it is ordered that the prothonotary notify the parties of the filing of this decree and that unless exceptions thereto are filed within 10 days a final decree will be entered. If exceptions are filed they shall be heard by the court in banc. If no exceptions are filed, counsel for Good Shepherd Home may present a form of final decree for the approval of the court.

From Edwin L. Kohler, Allentown, Pa.